1    LATHAM & WATKINS LLP
       Jennifer L. Barry (Bar No. 228066)
2        *jennifer.barry@lw.com*
       Adam A. Herrera (Bar No. 328043)
3        *adam.herrera@lw.com*
     12670 High Bluff Drive
4    San Diego, CA  92130
     858.523.5400 / 858.523.5450 (Fax)
5
     Attorneys for Plaintiff
6    1661, Inc. d/b/a GOAT

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       SOUTHERN DIVISION

11

| | |
|---|---|
| 12  1661, INC. d/b/a GOAT,<br>a Delaware corporation, | CASE NO.    8:23-cv-00490 |
| 13              Plaintiff, | **Complaint For:** |
| 14       v. | **(1)   Trademark Infringement**<br>     **(Lanham Act, 15 U.S.C. § 1114)** |
| 15  GREEN GOAT, LLC, a California<br>limited liability company; MARIO<br>16  TOVAR, an individual; ERIC<br>GATES, an individual; and DOES<br>17  1-10, | **(2)   Unfair Competition/False**<br>     **Designation of Origin**<br>     **(Lanham Act, 15 U.S.C. § 1125(a))** |
| 18              Defendants. | **(3)   Common Law Trademark**<br>     **Infringement** |
| 19 | **(4)   Common Law Unfair Competition** |
| 20 | **(5)   False Advertising**<br>     **(Lanham Act, 15 U.S.C. § 1125(a))** |
| 21 | |
| 22 | **(6)   Violation of California's Unfair**<br>     **Competition Law**<br>     **(Bus. & Prof. Code § 17200 *et seq.*)** |
| 23 | |
| 24 | **DEMAND FOR JURY TRIAL** |

25

26

27

28

# COMPLAINT

## NATURE OF ACTION

1.     Plaintiff 1661, Inc. d/b/a GOAT ("GOAT") brings this Complaint against Defendants Green Goat, LLC, Mario Tovar, Eric Gates, and Does 1-10 (collectively, "Defendants") for (i) federal trademark infringement, false designation of origin, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); (ii) common law trademark infringement and unfair competition under California law; (iii) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (iv) violations of California's Unfair Competition Law under California Business and Professions Code § 17200 *et seq.*

2.     By using their confusingly similar GREEN GOAT trademark (the "GREEN GOAT Mark") on identical and/or closely related goods and services, Defendants threaten to usurp GOAT's hard-earned goodwill.  Further, Defendants are harming GOAT's business by engaging in false advertising and misleading consumers into purchasing Defendants' products.

3.     GOAT alleges with knowledge concerning its own acts, and on information and belief as to all other matters (unless otherwise specifically stated), as follows:

## THE PARTIES

4.     GOAT is a Delaware corporation with its principal place of business at 3433 W. Exposition Place, Los Angeles, CA 90018.

5.     Defendant Green Goat, LLC ("Green Goat") is a California limited liability company with its principal place of business at 3161 Redhill Avenue, Costa Mesa, California 92626.  Green Goat conducts business and provides goods and services using the GREEN GOAT Mark throughout the United States, including California and within this District.

6.     Defendant Mario Tovar ("Tovar") is an individual who owns and operates a business that provides goods and services using the GREEN GOAT

1  Mark throughout the United States, including California and within this District.
2  Tovar resides in California.

3      7.    Defendant Eric Gates ("Gates") is an individual who owns and
4  operates a business that provides goods and services using the GREEN GOAT
5  Mark throughout the United States, including California and within this District.
6  Gates resides in California.

7      8.    At all relevant times, Tovar was, as applicable, the principal, owner,
8  director, officer, managing member, shareholder, member, central figure, and/or
9  the representative of Green Goat, and he authorized, approved, directed, controlled,
10  ratified, participated in, instigated, and/or was otherwise the moving, active,
11  central, and/or conscious force or figure behind the unlawful activity alleged
12  herein.

13     9.    At all relevant times, Gates was, as applicable, the principal, owner,
14  director, officer, managing member, shareholder, member, central figure, and/or
15  the representative of Green Goat, and he authorized, approved, directed, controlled,
16  ratified, participated in, instigated, and/or was otherwise the moving, active,
17  central, and/or conscious force or figure behind the unlawful activity alleged
18  herein.

19    10.    At all relevant times, Green Goat was the alter ego of Tovar because
20  there is a unity of interest and ownership between them, such that their separate
21  personalities no longer existed and any failure to disregard the corporate form
22  would result in a fraud or injustice.

23    11.    At all relevant times, Green Goat was the alter ego of Gates because
24  there is a unity of interest and ownership between them, such that their separate
25  personalities no longer existed and any failure to disregard the corporate form
26  would result in a fraud or injustice.

27    12.    Does 1-10 are persons or entities responsible in whole or in part for
28  the wrongdoing alleged herein ("Doe Defendants").  Each of the Doe Defendants

1 | participated in, ratified, endorsed, and/or was otherwise involved in the acts
2 | complained of, and they have liability for such acts. GOAT will further amend this
3 | Complaint if and when the identities of such persons or entities and/or the scope of
4 | their actions become known.

5 |      13.    At all relevant times, Green Goat, Tovar, Gates, and Doe Defendants
6 | acted as the principal, agent, and/or representatives of each of the other
7 | Defendants. Any action by one of the Defendants was within the course and scope
8 | of the agency relationship between the Defendants and was with the permission,
9 | ratification, and/or authorization of each of the other Defendants.

10 |      14.    As fully detailed below, Defendants use the GREEN GOAT Mark in a
11 | manner that violates GOAT's longstanding and strong rights in its GOAT® mark.

12 |      15.    Defendants are also using the GREEN GOAT Mark to engage in a
13 | false advertising campaign, as they are using this mark to disseminate false and
14 | misleading information about the products they offer. Consumers have relied on
15 | Defendants' false advertising to purchase products from Defendants instead of
16 | GOAT.

17 |      16.    Defendants compete directly with GOAT by offering similar goods
18 | and services, including apparel, accessories, and online retail store services. But
19 | for Defendants' false advertising, consumers would not have purchased or
20 | accessed Defendants' various goods and services. Thus, by engaging in false
21 | advertising, Defendants are diverting consumers and business away from GOAT.

22 | **JURISDICTION AND VENUE**

23 |      17.    Pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1338(a), this Court
24 | has subject matter jurisdiction over GOAT's claims for relief for violation of the
25 | Lanham Act. Pursuant to 28 U.S.C. § 1338(b), this Court has supplemental
26 | jurisdiction over GOAT's state law claims because they are joined with substantial
27 | and related claims under the Lanham Act. This Court also has supplemental

28 |

1    jurisdiction over GOAT's state law claims pursuant to 28 U.S.C. § 1367(a) because

2    all of GOAT's claims arise out of a common nucleus of operative facts.

3          18.    This Court has personal jurisdiction over Defendants because

4    Defendants reside within the State of California and have (a) conducted substantial

5    business in the State of California and this District by advertising, targeting,

6    offering, selling, and providing their goods/services to residents of this District;

7    (b) derived financial benefits from residents of the State of California by doing so;

8    (c) purposefully availed themselves of the privilege of conducting business within

9    the State of California; (d) sought the protection and benefits of the laws of the

10    State of California; and (e) the causes of action arise from Defendants' activities

11    within and actions targeted at the State of California.

12          19.    Venue in this Court exists under (a) 28 U.S.C. §§ 1391(b)(1),

13    (c)(1)-(2), as Defendants reside in the State of California and at least one of the

14    Defendants resides in this District; and (b) 28 U.S.C. § 1391(b)(2) as a substantial

15    part of the events giving rise to GOAT's claims occurred within this District.

16               **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

17                 **GOAT and Its Successful GOAT® Brand**

18          20.    Under the GOAT® mark, GOAT operates a wildly popular

19    e-commerce platform which is available on both a mobile app and website

20    (*www.goat.com*).  The GOAT® app and website facilitate the buying and selling, as

21    well as authentication, of sneakers, clothing, jewelry, purses, wallets, bags, and

22    various fashion accessory items, among other things.

23          21.    GOAT's online platform is a runaway success.  The GOAT® app is

24    downloaded hundreds of thousands of times every month, and GOAT's platform

25    has tens of millions of users around the world.

26          22.    As a result of its well-managed and trusted platform, GOAT has

27    developed significant goodwill with its users.  Indeed, consumers have come to

28

1   recognize GOAT as a trusted source for high quality clothing items and
2   accessories.

3       23.    In addition to its online platform, GOAT (and its predecessors in
4   interest) have, since the early 2000s, been engaged in designing, marketing, and
5   selling GOAT® branded clothing and accessories.

6       24.    GOAT's fame and high-quality goods and services have resulted in
7   numerous co-branding business relationships with some of the top fashion brands
8   in the world.  For example, Burberry partnered with GOAT to launch the brand's
9   Arthur sneaker exclusively on GOAT's platform.  This was preceded by similar
10  launches with globally recognized brands such as Versace, Chloe and McQ.
11  GOAT also partnered with Bergdorf Goodman to display highly sought-after
12  sneakers in Bergdorf Goodman's iconic store on Fifth Avenue in New York City.

13      25.    Most recently, GOAT partnered with famed soccer club Paris Saint-
14  Germain to launch the People of Paris campaign.  The partnership is not only a
15  visual branding experience, but includes the launch of a curated collection of new
16  and vintage apparel.

17  ### GOAT's Intellectual Property Rights

18      26.    GOAT owns, and has obtained United States federal registrations for,
19  a number of trademarks consisting of the term "goat":

| Trademark | Class and Description of Goods and Services | Reg. No. Reg. Date |
|---|---|---|
| GOAT | Class 25: Clothing, namely, shirts, pants; knitwear, namely, knit shirts; ladies' clothing, namely, dress suits; coats, frocks, skirts, dresses, jackets, clothing jerseys, sweaters, trousers, clothing tops, and fashion clothing, namely evening gowns | 3506834 09/30/2008 |
| GOAT | Class 35: Catalog ordering service featuring clothing and clothing accessories; online retail store services featuring clothing and clothing accessories; information services relating to all of the above services | 4103419 02/28/2012 |

20
21
22
23
24
25
26
27
28

| Trademark | Class and Description of Goods and Services | Reg. No. Reg. Date |
|---|---|---|
| GOAT | Class 9: Computer application software allowing users to find, research, analyze, compare, sell, and purchase goods and services via the Internet, global computer communication networks, and wireless telecommunications networks | 4908318 03/01/2016 |
| GOAT | Class 35: Providing an online marketplace for buyers and sellers of collectible consumer goods namely, athletic and sporting footwear; database management services; providing a website featuring evaluative feedback in the form of ratings, reviews, recommendations and other consumer information regarding the value and prices of sellers' goods, buyers' and sellers' performance, delivery, and transaction experience for commercial purposes; providing a searchable advertising guide featuring the goods and services of sellers; advertising and advertising services | 5357448 12/19/2017 |
| GOAT | Class 38: Telecommunication services, namely transmission of electronic messages, text messages, and push-notification alerts between consumer product buyers and sellers on the Internet, global computer communications networks, and wireless telecommunications networks | 5020477 08/16/2016 |
| GOAT | Class 42: Providing temporary use of online non-downloadable software for electronic business transactions in online marketplaces utilizing the Internet, global computer communication networks, and wireless telecommunications networks; authentication services in the field of collectible consumer goods, namely, the inspection and verification of authenticity of athletic and sporting footwear, apparel, and works of art | 5020478 08/16/2016 |

27.     The foregoing marks are collectively referred to as the "GOAT Marks."  The foregoing registrations are collectively referred to as the "GOAT Registrations."

28.     A number of the GOAT Registrations, including the registration covering clothing (Reg. No. 3506834), are incontestable pursuant to 15 U.S.C. § 1065, which constitutes conclusive evidence of the registrations' validity, as well as GOAT's entitlement to the exclusive use of the marks in commerce throughout the United States on the goods and services listed in the registrations.

29.     Further, the GOAT Registrations constitute prima facie evidence that the GOAT Marks are valid, and that GOAT is entitled to the exclusive use of the

1  GOAT Marks in commerce throughout the United States on the goods and services
2  listed in the registrations.

3       30.    GOAT, and its predecessors in interest, have been and are now
4  engaged in the business of developing, creating, distributing, marketing,
5  advertising, and selling a broad range of clothing items and accessories under the
6  GOAT Marks.  In fact, through its predecessors in interest, GOAT has been using
7  the GOAT Marks for clothing and accessories for over 20 years.

8       31.    Through careful cultivation of its goods and services provided under
9  the GOAT Marks, GOAT has developed an outstanding reputation as a provider of
10  high quality clothing items and accessories.  GOAT has also become a household
11  name in the fashion industry and has developed an extremely loyal customer
12  following.

13       32.    Through GOAT's widespread and continuous use of its family of
14  GOAT Marks, these marks have acquired extensive goodwill, developed a high
15  degree of distinctiveness, and become well-known and recognized as identifying
16  goods and services that originate from GOAT.

17                   **Defendants' Unauthorized Use of the GOAT Marks**

18       33.    In 2020, Defendants launched a clothing and apparel company using
19  the GREEN GOAT Mark, a trademark which incorporates the entirety of the
20  GOAT® mark.  Defendants were aware of GOAT when they adopted this
21  trademark.

22       34.    For example, before adopting the GREEN GOAT Mark, Defendants
23  used GOAT's services and platform to sell products.

24       35.    With knowledge that the GOAT® mark was similar to and had priority
25  over the GREEN GOAT Mark, Defendants launched their GREEN GOAT brand
26  full scale, including by registering domain names and social media accounts,
27  creating a website, developing products, and filing several trademark applications
28  for the mark.

36.    Defendants own the *greengoatco.com* and *greengoatgolf.com* domain names and operate a website at these domain names to offer their goods and services.  Defendants use the GREEN GOAT Mark on their website to offer various goods, including clothing items for men and women, as well as related accessories:



(*www.greengoatgolf.com/search?type=product&q=goat*)

37.    Defendants also advertise their goods and services using the GREEN GOAT Mark on various social media platforms, such as Facebook, Instagram, and YouTube (the "Social Media Accounts").  On each platform, Defendants prominently display the GREEN GOAT Mark, as shown in the below example:



(*www.youtube.com/@greengoat7218*)

38.    Defendants are also using the GREEN GOAT Mark and *greengoatgolf.com* website to redirect consumers to another company that Defendants are affiliated with, which is called Streetwear Official, Inc. ("Streetwear").

39.    For example, Defendants are publishing the following advertisement on the *greengoatgolf.com* website:



(*www.greengoatgolf.com*)

40.    After consumers type in their email address in the box above, they immediately receive the following welcome email from Streetwear:



41.    Not only does this email introduce consumers to Streetwear, but it also promotes Streetwear's website, which is available at *streetwearofficial.com*.

42.    On the *streetwearofficial.com* website, Streetwear operates a platform where consumers can purchase apparel from some of the top fashion brands in the world, such as Supreme, Balenciaga, Adidas, and BAPE, among many others, as shown below:



(*www.streetwearofficial.com/collections/best-sellers*)



(*www.streetwearofficial.com/collections/best-sellers*)

43.    Many of the brands that are sold on Streetwear's website (including Supreme, Balenciaga, Adidas, and BAPE) are brands that are also sold on GOAT's website.  Indeed, not only are the brands identical, but many of the products being sold are identical as well.  For example, all of the Adidas products pictured above are also sold on GOAT's website.

44.    Further, Streetwear is selling products using the GREEN GOAT Mark, as seen below:



*(www.streetwearofficial.com/search?type=product&q=green+goat)*

45.     In light of GOAT's renown, online presence, and long history of providing goods and services under the GOAT Marks, GOAT is understandably concerned that consumers will likely be confused and mistakenly believe that Defendants and their goods and/or services are endorsed, approved, or sponsored by, or affiliated, connected, or associated with, GOAT.

46.     Defendants intentionally adopted the GREEN GOAT Mark to capitalize on GOAT's success.  Indeed, Defendants were well aware of GOAT's rights to the GOAT® mark.  Defendants nonetheless went forward with building their GREEN GOAT brand.

47.     As a further attempt to capitalize upon the GOAT® brand, Defendants have, at times, dropped the "GREEN" portion of the GREEN GOAT Mark.  Thus,

Defendants' products have appeared as GOAT-branded products, as seen in the below examples:





48.    By using GOAT's mark, Defendants reap the benefits of GOAT's reputation and goodwill based on consumer confusion, all to GOAT's detriment.

49.    On December 24, 2020, Defendants filed an application (Serial No. 90/410459) with the U.S. Patent and Trademark Office ("USPTO") to register the GREEN GOAT Mark for various clothing items and online retail store services.

50.    On August 12, 2021, Defendants filed additional applications (Serial Nos. 90/880420, 90/880438, 90/880442) with the USPTO to register the GREEN

1    GOAT Mark for a broad range of accessories and additional clothing items.

2    Collectively, Defendants' trademark applications for the GREEN GOAT Mark are

3    referred to as the "Infringing Applications."

4        51.    On November 23, 2021, GOAT opposed one of the Infringing

5    Applications, Serial No. 90/410459, in the USPTO's Trademark Trial and Appeal

6    Board ("TTAB"), after it was published for opposition.  GOAT opposed the

7    remaining Infringing Applications in the TTAB on July 26, 2022, after they were

8    published for opposition.

9        52.    The oppositions were consolidated into a single proceeding in the

10   TTAB (Opp. No. 91/273101).  Defendants filed an answer to GOAT's opposition,

11   and this action remains pending before the TTAB.

12       53.    GOAT attempted to reconcile its concerns with Defendants, including

13   through a letter sent on March 28, 2022, various follow-up correspondence, and by

14   opposing the Infringing Applications.  However, Defendants have refused to

15   meaningfully engage in negotiations, let alone cease use of their infringing mark.

16       54.    Defendants' refusal to cease using the GREEN GOAT Mark

17   unfortunately comes as no surprise.  Indeed, Defendants are serial violators of

18   intellectual property rights, which is further evidence that Defendants are willfully

19   violating GOAT's trademark rights.

20       55.    For example, Defendants are using the trademarks of other

21   companies, without authorization, to sell GREEN GOAT-branded products.  As

22   shown below, Defendants use the CALLAWAY® mark—a mark owned by

23   Callaway Golf Company—to sell products:

24

25

26

27

28



*(www.greengoatgolf.com/search?type=product&q=callaway)*

56.    Defendants also use the MASTERS® mark—a mark owned by Augusta National, Inc.—to sell products:



57.     Additionally, Defendants use the copyrights and/or rights of publicity (including name, image, and likeness) of several athletes and movie characters to sell products, as shown in the below examples:



*(www.greengoatgolf.com/collections/all/products/the-winning-goat)*



(picture of golf player Tiger Woods, taken from *getwallpapers.com/collection/tiger-woods-wallpapers*)



*(http://web.archive.org/web/20220328182508/https://greengoatco.com/collections/tshirts/products/knockout-goat-t-shirt?variant=39979008032956)*



*(picture of boxer Muhammad Ali, taken from https://i.ebayimg.com/images/g/FwIAAOSwIjJZQoGu/s-l400.jpg)*



*(www.greengoatgolf.com/collections/all/products/happy-goat)*



(picture from Universal Pictures' movie "Happy Gilmore," taken from *www.pinterest.com/pin/429741989415411890*)

58.    As a final example of Defendants' large-scale infringement, Defendants sell products that trade off Nike's iconic "JUST DO IT" slogan. Indeed, Defendants sell products using the marks "JUST GOLF," "JUST BIRDIED," and "JUST BOGEY'D," among other variations of "JUST DO IT":





59.     In addition to using the above marks, Defendants have gone the extra step of filing several applications with the USPTO to register these marks, among others.  Indeed, Defendants applied for the marks "JUST BOMBED IT" (Serial Nos. 90/893694, 90/893700), "JUST PAR'D" (Serial Nos. 90/880360, 90880355), "JUST BOGEY'D" (Serial Nos. 90/880377, 90/880370), "JUST BOMBED" (Serial Nos. 90/880389, 90880384), "JUST BIRDIED" (Serial Nos. 90718375, 90880448, 90880453), and "JUST GOLF" (Serial Nos. 97129934, 97129975).

60.     In light of the above, it is apparent that Defendants are serial violators of intellectual property rights and are knowingly violating several different rights. Thus, GOAT is just one of ***many*** victims to Defendants' willful violation of intellectual property rights.

61.     Given Defendants' failure to respond to GOAT's concerns, Defendants' continuing use of the GREEN GOAT Mark, and Defendants'

LATHAM&WATKINSᴸᴸᴾ US-DOCS\138636990
ATTORNEYS AT LAW

COMPLAINT
DEMAND FOR JURY TRIAL

1    determination to cause consumer confusion, GOAT is forced to bring this suit to

2    fully litigate and resolve the trademark issues between the parties.

3    **<u>Defendants' False Advertising</u>**

4    62.    Not only are Defendants using the GREEN GOAT Mark to infringe

5    GOAT's trademarks, but they are also using their mark to engage in false

6    advertising and to deceive consumers into purchasing Defendants' products.

7    63.    Specifically, Defendants are using the GREEN GOAT Mark to make

8    false and misleading statements about (1) their sales, (2) their website traffic, and

9    (3) the cost of their products.

10    64.    By falsifying their sales and website traffic, Defendants are creating a

11    false sense of scarcity among consumers.  This scarcity mindset is causing

12    consumers to purchase Defendants' products.

13    65.    Further, by advertising coupon codes to make their products appear on

14    sale (e.g., 30% off), Defendants are misleading consumers into believing that they

15    are getting a bargain or good deal.  In reality, consumers are not getting a deal at

16    all, since the coupon codes are always available and Defendants' products are

17    never sold at their original price (i.e., the inflated price).  Yet consumers are

18    unaware of Defendants' deceitful marketing tactics, so they are purchasing

19    Defendants' products under the mistaken perception of getting a bargain.

20    66.    As GOAT and Defendants are direct competitors, Defendants' false

21    advertising gives them an unfair advantage over GOAT in the marketplace.

22    Indeed, Defendants are using their false advertising to steal sales and customers

23    away from GOAT.

24    <u>False Sales</u>

25    67.    From 2021 to 2022, Defendants published popups in the bottom left-

26    hand corner of their website.  These popups purported to show consumer purchases

27    of Defendants' products in real time:

28

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15



16    68.    As shown in the above example, these popups identified (1) one of

17  Defendants' products that was allegedly purchased, (2) the time of purchase, and

18  (3) the location of the consumer who made the purchase.

19    69.    If consumers clicked these popups, they were taken directly to that

20  product on Defendants' website so that they, too, can purchase it.

21    70.    However, these popups showed fake sales.  For example, when the

22  popup above was published on Defendants' website, no one "recently bought a

23  G.O.A.T. Snapback 55 minutes ago, from from [sic] New York US."

24    71.    Defendants created several of these popups on their website,

25  additional examples of which are shown below:

26
27    
28

1



Someone recently bought a **Rough Day White T-Shirt**

45 minutes ago, from from Utah, US

72.     These popups showed fake sales, since Defendants used the same popups—**word for word**—throughout 2021 and 2022.  In other words, anytime a consumer accessed Defendants' website, they would see a cycle of the same popups (including the popups above) showing the alleged purchase of Defendants' products.  These popups did not change, so regardless of the day or time that Defendants' website was accessed, consumers would see the same cycle of popups. This was not merely a coincidence, as these popups did not show legitimate sales.

73.     Defendants used these popups and falsified the sale of their products to make those products appear in higher demand than they actually were.  For example, anytime a consumer accessed Defendants' website, he or she would be misled into believing that another consumer recently purchased a "G.O.A.T. Snapback," despite the fact that no such sale was made.

74.     Defendants' popups impacted consumer psychology and decision-making.  Consumers who saw these popups purchased the products that were being advertised, since they believed that the advertised products were popular, in high demand, and being sold in large volumes.

75.     Additionally, because these popups were being continuously published on Defendants' website, consumers were misled into believing that **all** of Defendants' products were generally popular, in high demand, and being sold in large volumes—even if those products were not shown in the misleading popups.

76.     Consumers felt an overall sense of scarcity and urge to purchase Defendants' products before they were sold out, since there was a general perception that all of Defendants' products were being sold quickly.  Because of this perception, consumers were misled into purchasing Defendants' products.

77.     Thus, by falsifying their sales, Defendants misled consumers, increased their sales, and ultimately, increased their profits.

78.     GOAT attempted to reconcile its concerns with Defendants' false advertising by sending a letter on March 28, 2022, demanding that Defendants cease their unlawful conduct.  Defendants ceased their false advertising for a brief period of time by removing their deceptive popups, but they resumed shortly thereafter.

<u>False Website Traffic</u>

79.     Defendants have also falsified the number of consumers who allegedly accessed Defendants' website in real time.

80.     From 2021 to 2023, whenever consumers clicked on any products that were offered on Defendants' website, they were shown the number of other consumers who were allegedly viewing that same product in real time, as seen in the below example:



*(www.greengoatgolf.com/products/g-o-a-t-visor?variant=40027373338812)*

81.    However, when the above screen capture was taken, there were not "99 customers . . . viewing this product."  This is because Defendants used an algorithm on their website which randomly generated a number of "customers" who were allegedly "viewing this product."

82.    The alleged number of consumers viewing any one of Defendants' products was not correlated whatsoever to the real number of consumers actually viewing the product.  In fact, when a consumer was shown that a certain number of other "customers are viewing" that same product, in reality, that consumer may have been the only individual viewing the product.

83.    As evidence that Defendants used an algorithm to falsify the number of consumers viewing their products, if consumers clicked on **any** of Defendants' products at **any** point in time, they were **always** initially shown that "283 customers are viewing this product," as seen in the below examples:



(*www.greengoatgolf.com/products/g-o-a-t-visor?variant=40027373338812*)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW    US-DOCS\138636990

1
2
3
4
5
6
7
8
9
10
11
12



13   (*www.greengoatgolf.com/products/green-goat-golf-dimple-patterned-5-caps-1*)

14
15
16
17
18
19
20
21
22
23
24
25
26



27   (*www.greengoatgolf.com/products/stacked-logo-just-golf-dimple-patterned-*
28   *snapbacks*)

84.     After a few seconds, the number "283" changed to another number, and then that number continued to update every few seconds.  But if consumers refreshed the page, the number **always reset** to "283 customers."  This is not a coincidence; this pattern shows that Defendants falsified their numbers.

85.     Consumers who viewed Defendants' products were unaware that Defendants engaged in this deception.  For example, whenever a consumer viewed any of Defendants' products and was initially shown that "283 customers are viewing this product," that consumer believed that there were, in fact, 283 other customers viewing the product.  And when the "283 customers" changed to another number, that same consumer believed that the number simply updated in real time.

86.     When consumers saw that hundreds of other consumers were viewing Defendants' products, they were misled into believing that Defendants' products were popular, in high demand, and being sold in large volumes.

87.     Consumers felt an overall sense of scarcity and urge to purchase Defendants' products, since there was a general perception that hundreds of other consumers were viewing and purchasing Defendants' products.  Because of this perception, consumers were misled into purchasing Defendants' products.

88.     Thus, by falsifying the number of consumers accessing their website, Defendants misled consumers, increased their sales, and ultimately, increased their profits.

89.     GOAT attempted to reconcile its concerns with Defendants' false advertising by sending a letter on March 28, 2022, demanding that Defendants cease their unlawful conduct.  Defendants ceased their false advertising for a brief period of time by removing their deceptive algorithm, but they resumed shortly thereafter.

Fictitious Pricing / False Reference Pricing

90.    Finally, Defendants are engaging in a false advertising practice known as "fictitious pricing" or "false reference pricing."

91.    A seller's "reference price" is a price that provides consumers with a point of reference with which to evaluate the prospective purchase.  False reference pricing refers to a seller's act of misrepresenting the original price of a good by inflating the price, and then purportedly offering the good on sale or discount to try and increase sales of that good.

92.    Some sellers, like Defendants, who are well aware of consumer susceptibility to bargain psychology, have incentives to lie to consumers by falsely claiming that their products are on discount.  These dishonest sellers inflate their original prices (despite not actually selling their products at those inflated prices), and then offer some sort of discount on the products.  This is done to fool consumers into believing that they are getting a bargain or good deal, and ultimately, to induce consumers to purchase more products.

93.    From 2021 through the present, Defendants have engaged in false reference pricing on their website to advertise and sell their GREEN GOAT products.  Specifically, Defendants inflate the original price of all their products, and they offer a coupon code to lower the prices.  For example, Defendants prominently advertise on their website that their products are 30% off after using a coupon code:



94.    Defendants also promote these coupons through their email marketing campaigns:



95.    If consumers try to purchase products from Defendants' website, before checking out, they are asked to enter a coupon code.  After applying the coupon code that Defendants advertise, consumers are immediately given 30% off their entire purchase, as seen in the below example:



96.    Consumers who use Defendants' coupons believe they are getting a bargain or good deal, since they are saving money on their purchase.  But in reality, the consumers are not getting any deal at all.  That is because Defendants have always advertised coupon codes.  Indeed, Defendants have nearly always made coupon codes available on their website—ranging from 10% to 30% off—as Defendants do not sell their products without coupon codes.

97.    To further create the perception of a bargain and mislead consumers, Defendants will even create a false sense of urgency with their coupon codes.  For example, Defendants will email consumers stating that the coupon codes are only available for a limited time, e.g., through midnight:



98.    But in reality, these coupon codes are always available, which makes Defendants' statements false.

99.    Because Defendants always make coupons available for their products, the advertised original prices for those products are not true original prices.  These are inflated prices, since consumers can always purchase

1   Defendants' products at a lower price with a coupon.  In other words, Defendants'
2   products were never intended to be sold at their advertised inflated or original
3   prices.

4       100.   Defendants are engaging in this false advertising to take advantage of
5   consumer psychology, as Defendants are aware that consumers are more likely to
6   make a purchase when they perceive a bargain or good deal.

7       101.   Consumers who access Defendants' website and/or receive
8   Defendants' marketing materials are purchasing Defendants' products to take
9   advantage of the perceived bargain.  These consumers are unfortunately mistaken,
10  as they are simply purchasing Defendants' products at their original price.

11      102.   Thus, by engaging in false reference pricing, Defendants misled
12  consumers, increased their sales, and ultimately, increased their profits.

13  **GOAT Is Harmed By Defendants' Continuing Infringement, False**
14  **Advertising, and Unlawful Conduct**

15      103.   Defendants' continued use of the confusingly similar GREEN GOAT
16  Mark in commerce violates GOAT's valuable intellectual property rights in the
17  GOAT Marks and GOAT Registrations, and Defendants' knowing, intentional,
18  willful, and malicious use of the GREEN GOAT Mark is damaging to GOAT and
19  GOAT's property.

20      104.   Defendants have used the GREEN GOAT Mark to unfairly usurp and
21  capitalize on the value and goodwill of the GOAT Marks and GOAT Registrations.
22  Defendants are aware of GOAT's strong trademark rights and reputation in the
23  marketplace, but nevertheless, use the GREEN GOAT Mark to profit from the
24  goodwill associated with the GOAT Marks and GOAT Registrations.

25      105.   Defendants have intentionally and knowingly capitalized off of
26  confusion between the GOAT Marks, and the GREEN GOAT Mark, including by
27  providing goods that are nearly identical to the goods offered by GOAT.

28

106.    Defendants have also intentionally and knowingly used the GREEN GOAT Mark to engage in deceptive marketing practices in an effort to attract consumers away from GOAT and to steal market share from GOAT.

107.    Defendants compete directly with GOAT by offering similar goods and services, including apparel, accessories, and online retail store services. Because Defendants and GOAT are competitors, and consumers have been deceived into purchasing Defendants' products, Defendants are diverting consumers and business away from GOAT.

108.    Defendants' false advertising gives them an unfair competitive advantage, as consumers who are deceived by Defendants' false advertising are purchasing Defendants' products instead of GOAT's products.  As a result, GOAT has lost, and will continue to lose, sales, business, customers, and market share to Defendants.

109.    Defendants' false advertising is also tarnishing the GOAT® brand. Consumers who have learned about Defendants' false advertising have come to associate the GREEN GOAT brand as being dishonest and deceitful.  Because of this negative association, and the fact that consumer confusion has occurred and/or is likely to occur as a result of Defendants' trademark infringement, consumers will mistakenly associate the GOAT® brand as also being dishonest and deceitful. This has caused and/or is likely to cause harm to GOAT.

110.    Due to Defendants' continuing willful infringement, false advertising, and unlawful conduct, GOAT is now forced to bring this Complaint to protect its valuable and longstanding intellectual property rights.  GOAT had to retain counsel and incur substantial fees and costs (and it continues to incur those fees and costs) to prosecute this suit and pursue its claims.

111.    GOAT's interest in protecting its intellectual property rights and its products and services from consumer confusion outweigh any harm to Defendants.

1    The public interest is best served by granting GOAT's requested relief against

2    Defendants.

### FIRST CLAIM FOR RELIEF

### Federal Trademark Infringement – 15 U.S.C. § 1114

5    112.    GOAT incorporates by reference the factual allegations set forth

6    above.

7    113.    GOAT owns the GOAT Marks and the GOAT Registrations.  The

8    trademarks reflected in the GOAT Registrations are strong and distinctive and

9    designate GOAT as the source of all products and services advertised, marketed,

10   sold, or used in connection with the GOAT Marks.

11   114.    GOAT is the senior user of the GOAT Marks as it began use of those

12   marks in interstate commerce prior to Defendants' first use of the confusingly

13   similar GREEN GOAT Mark.

14   115.    Defendants do not have authorization, license, or permission from

15   GOAT to market and sell their goods and services under the GREEN GOAT Mark,

16   which is confusingly similar to the GOAT Marks, and which is used by Defendants

17   with goods and services that are identical and/or closely related to the particular

18   goods and services associated with the GOAT Marks.

19   116.    Defendants were aware of the GOAT Marks, as Defendants were on

20   constructive notice based on GOAT's longstanding federal registrations, as well as

21   on actual notice based on Defendants' prior use of GOAT's platform and services

22   to sell products and GOAT's numerous communications with Defendants about

23   this matter.  Yet, Defendants continued to use their GREEN GOAT Mark.  Thus,

24   Defendants' unauthorized use of the GREEN GOAT Mark was and is knowing,

25   intentional, and willful.

26   117.    As a direct and proximate result of Defendants' wrongful conduct,

27   GOAT has been and will continue to be damaged.

28   118.    Defendants' actions therefore constitute trademark infringement.

119.    Unless an injunction is issued enjoining any continuing or future use of the confusingly similar GREEN GOAT Mark by Defendants, such continuing or future use is likely to continue to cause confusion, mistake, or deception as to source, origin, affiliation, or sponsorship, and will thereby irreparably harm GOAT.

120.    Defendants' activities have caused and will continue to cause irreparable harm to GOAT, for which it has no adequate remedy at law, because: (i) the GOAT Marks comprise unique and valuable property rights that have no readily determinable market value; (ii) Defendants' infringement constitutes interference with GOAT's goodwill and customer relationships and is harming and will continue to substantially harm GOAT's reputation as a source of high-quality goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to GOAT, are continuing.  Accordingly, GOAT is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

121.    Pursuant to 15 U.S.C. §1117(a), GOAT is entitled to an order: (i) requiring Defendants to account to GOAT for any and all profits derived from their infringing actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by GOAT that were caused by Defendants' conduct.

122.    Defendants' conduct was and is intentional and without foundation in law, and, pursuant to 15 U.S.C. § 1117(a), GOAT is therefore entitled to an award of treble damages against Defendants.

123.    Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus GOAT is entitled to an award of attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Federal Unfair Competition/False Designation of Origin – 15 U.S.C. § 1125(a)

124.    GOAT incorporates by reference the factual allegations set forth above.

125.    The GOAT Marks are strong and distinctive and designate GOAT as the source of all goods and services advertised, marketed, sold, or used in connection with those marks.  In addition, by virtue of GOAT (and its predecessors) decades of use of the GOAT Marks in connection with its products and services, and its extensive marketing, advertising, promotion, and sale of its products and services under that mark and the GOAT Marks, the GOAT Marks, have acquired secondary meaning, whereby the consuming public of this district, the State of California, and the United States associate the GOAT Marks with a single source of products and services.

126.    GOAT is the senior user of the GOAT Marks as it began use of those marks in interstate commerce prior to Defendants' first use of the confusingly similar GREEN GOAT Mark.

127.    Defendants were aware of the GOAT Marks because Defendants were on constructive notice based on GOAT's longstanding federal registrations, as well as on actual notice based on Defendants' prior use of GOAT's platform and services to sell products and GOAT's numerous communications with Defendants about this matter.  Yet, Defendants continued to use their GREEN GOAT Mark. Thus, Defendants' unauthorized use of the GREEN GOAT Mark was and is knowing, intentional, and willful.

128.    Through their use of the confusingly similar GREEN GOAT Mark, Defendants intended to, and did in fact, confuse and mislead consumers into believing, and misrepresented and created the false impression, that GOAT somehow authorized, originated, sponsored, approved, licensed, or participated in Defendants' use of the confusingly similar GREEN GOAT Mark.

129.    In fact, there is no connection, association, or licensing relationship between GOAT and Defendants, nor has GOAT ever authorized, licensed, or given permission to Defendants to use the confusingly similar GREEN GOAT Mark in any manner.

130.    Defendants' use of the confusingly similar GREEN GOAT Mark will likely cause confusion as to the origin and authenticity of Defendants' website, the Social Media Accounts, and the related goods and services promoted and sold through these channels.  Moreover, Defendants' use of the GREEN GOAT Mark will likely cause others to believe that there is a relationship between Defendants and GOAT when there is, in fact, not.

131.    As a direct and proximate result of Defendants' wrongful conduct, GOAT has been and will continue to be damaged.

132.    Defendants' actions thus constitute false designation of origin and unfair competition.

133.    Defendants' activities have caused, and will continue to cause, irreparable harm to GOAT, for which it has no adequate remedy at law, in that: (i) the GOAT Marks comprise unique and valuable property rights that have no readily determinable market value; (ii) Defendants' infringement constitutes interference with GOAT's goodwill and customer relationships and will substantially harm GOAT's reputation as a source of high-quality goods and services; and (iii) Defendants' wrongful conduct, and the damages resulting to GOAT, are continuing.  Accordingly, GOAT is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

134.    Pursuant to 15 U.S.C. §1117(a), GOAT is entitled to an order: (i) requiring Defendants to account to GOAT for any and all profits derived from its actions, to be increased in accordance with the applicable provisions of law; and (ii) awarding all damages sustained by GOAT that were caused by Defendants' conduct.

135.    Defendants' conduct was and is intentional and without foundation in law, and pursuant to 15 U.S.C. § 1117(a), GOAT is therefore entitled to an award of treble damages against Defendants.

136.   Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus GOAT is entitled to an award of attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF

## Common Law Trademark Infringement

137.   GOAT incorporates by reference the factual allegations set forth above.

138.   GOAT has valid and protectable common law rights in the GOAT Marks.

139.   GOAT is the senior user of the GOAT Marks.

140.   Defendants' conduct constitutes infringement of GOAT's common law rights in the GOAT Marks.

141.   Defendants' use of the confusingly similar GREEN GOAT Mark on unauthorized goods and services is likely to cause confusion as to the origin of Defendants' goods and services and is likely to cause others to believe that there is a relationship between Defendants and GOAT.

142.   Defendants' wrongful acts have permitted and will permit them to receive substantial profits based upon the strength of GOAT's reputation and the substantial goodwill it has built up in the GOAT Marks.

143.   As a direct and proximate result of Defendants' wrongful conduct, GOAT has been and will continue to be damaged.

144.   Unless an injunction is issued enjoining any continuing or future use of the GOAT Marks by Defendants, such continuing or future use is likely to continue to cause confusion and thereby irreparably damage GOAT.  GOAT has no adequate remedy at law.  Accordingly, GOAT is entitled to an injunction.

## FOURTH CLAIM FOR RELIEF

## Common Law Unfair Competition

145.   GOAT incorporates by reference the factual allegations set forth above.

146.   GOAT has expended significant time and expense in developing the GOAT Marks and the high-quality products and services it markets and sells under those marks.  The GOAT Marks have been very successful and have developed a substantial reputation and goodwill in the marketplace.

147.   Through their wrongful conduct, Defendants have misappropriated GOAT's efforts and are exploiting the GOAT Marks and GOAT's reputation to market and sell their services under the GREEN GOAT Mark.  These actions constitute unfair competition.

148.   As a direct and proximate result of Defendants' wrongful conduct, GOAT has been and will continue to be damaged.

149.   Unless an injunction is issued enjoining Defendants' unfairly competitive conduct, GOAT will continue to be damaged irreparably.  GOAT has no adequate remedy at law.  Accordingly, GOAT is entitled to an injunction.

150.   Defendants have acted willfully, intentionally, and maliciously, such that GOAT is entitled to punitive damages.

## FIFTH CLAIM FOR RELIEF

## False Advertising – 15 U.S.C. § 1125(a)

151.   GOAT incorporates by reference the factual allegations set forth above.

152.   Defendants have made numerous false and misleading statements of fact concerning their products, including by making false and misleading statements about (1) their sales, (2) their website traffic, and (3) the cost of their products.

153.   Defendants made false and misleading statements about their sales by advertising popups on their websites that showed sales that never actually occurred.

154.   Defendants made false and misleading statements about their website traffic by advertising the number of consumers who were allegedly viewing

Defendants' products. These numbers purportedly updated in real time. However, these numbers did not show the true number of consumers who were actually viewing Defendants' products. Instead, these numbers were fake, as they followed an algorithm set by Defendants, and the numbers were in no way related to the actual number of consumers viewing Defendants' products.

155. Defendants are making false and misleading statements about the cost of their products by inflating the original price of their products, only to always offer coupons to make their products appear on sale. Further, Defendants email consumers with coupons, claiming that the coupons are only valid for a limited time only, despite the fact that Defendants always offer coupons for their products.

156. Defendants' false and misleading statements are material to consumers' purchasing decisions. Consumers relied on Defendants' false and misleading statements when making the decision as to whether or not to purchase Defendants' products.

157. Defendants' statements were produced and used in advertising and on their website, social media accounts, and emails to consumers, all of which were published on the Internet and entered interstate commerce.

158. Defendants' false and misleading statements have actually deceived or are likely to deceive their intended audience. Moreover, these statements have influenced or are likely to influence the deceived consumers' purchasing decisions.

159. Defendants compete directly with GOAT by offering similar goods and services, including apparel, accessories, and online retail store services.

160. Because Defendants and GOAT are competitors, and consumers have been misled into purchasing Defendants' products, Defendants are diverting and/or are likely to divert consumers and business away from GOAT.

161. Defendants' false advertising is also tarnishing the GOAT® brand, as the GREEN GOAT brand is associated with dishonest and deceitful practices.

162.   As a result, GOAT has been injured and/or is likely to suffer injury by Defendants' false and misleading statements.

163.   Defendants' activities have caused and will continue to cause irreparable harm to GOAT, for which it has no adequate remedy at law, because: (i) GOAT's business and goodwill, including its GOAT Marks, comprise unique and valuable property rights that have no readily determinable market value; (ii) Defendants' false advertising constitutes interference with GOAT's goodwill, customer relationships, and market share; and (iii) Defendants' wrongful conduct, and the damages resulting to GOAT, are continuing.  Accordingly, GOAT is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

164.   Defendants' conduct was and is intentional and without foundation in law, and pursuant to 15 U.S.C. § 1117(a), GOAT is therefore entitled to an award of treble damages against Defendants.

165.   Defendants' acts make this an exceptional case under 15 U.S.C. § 1117(a); thus GOAT is entitled to an award of attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law

### (Bus. & Prof. Code § 17200 *et seq.*)

166.   GOAT incorporates by reference the factual allegations set forth above.

167.   California's Unfair Competition Law ("UCL") defines unfair business competition as any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising."

168.   Under the "unlawful" prong, the UCL borrows violations from other laws by making them independently actionable as unfair competitive practices.

169.   Defendants have violated (and continue to violate) the UCL by engaging in **unlawful** business acts and practices prohibited by the Federal Trade

1  Commission Act ("FTCA") and California's Consumer Legal Remedies Act

2  ("CLRA").

3        170.   The FTCA prohibits "unfair or deceptive acts or practices in or

4  affecting commerce," 15 U.S.C. § 45(a)(1) and the dissemination of "any false

5  advertisement," 15 U.S.C. § 52(a).  The Federal Trade Commission publishes

6  Guides for the interpretation of the FTCA, and warns that "[f]ailure to comply with

7  the guides may result in corrective action by the Commission under applicable

8  statutory provisions."  16 C.F.R. § 1.5.

9        171.   The Federal Trade Commission provides in its Guides Against

10 Deceptive Pricing that fictitious pricing—like the pricing scheme used by

11 Defendants—violates the FTCA:

12             One of the most commonly used forms of bargain advertising is

13             to offer a reduction from the advertiser's own former price for

14             an article. If the former price is the actual, bona fide price at

15             which the article was offered to the public on a regular basis for

16             a reasonably substantial period of time, it provides a legitimate

17             basis for the advertising of a price comparison. Where the

18             former price is genuine, the bargain being advertised is a true

19             one. If, on the other hand, the former price being advertised is

20             not bona fide but fictitious - *for example, where an artificial,*

21             *inflated price was established for the purpose of enabling the*

22             *subsequent offer of a large reduction - the "bargain" being*

23             *advertised is a false one*; the purchaser is not receiving the

24             unusual value he expects. In such a case, the "reduced" price is,

25             in reality, probably just the seller's regular price.

26        16 C.F.R. § 233.1 (emphasis added).

27        172.   Defendants are violating the FTCA by offering fictitious and inflated

28 prices for their products, rather than bona fide or genuine prices.  Defendants

established artificial, inflated prices for their products so as to make the large price

reduction that consumers receive after applying coupons appear to be a bargain.

The original prices of Defendants' products are fictitious prices because those

products are never openly and actively offered for sale at original prices without

coupons, or are not offered for sale at original prices without coupons for a

reasonably substantial period of time and in honesty or good faith. Instead,

Defendants publish their false and inflated original prices for the sole purpose of

establishing a fictitious higher price on which a deceptive comparison might be

based, in violation of the FTCA and the FTC guides.

173. The CLRA also prohibits Defendants' deceptive and misleading

conduct. The California Civil Code sets forth a list of "unfair methods of

competition and unfair or deceptive acts or practices" which are prohibited under

the CLRA. Cal. Civ. Code § 1770(a). Specifically, Section 1770(a)(3) forbids

businesses from "[m]aking false or misleading statements of fact concerning

reasons for, existence of, or amounts of price reductions." *Id.* § 1770(a)(13).

174. Because Defendants' fictitious pricing is a false or misleading

statement of fact concerning the alleged price reductions of Defendants' products,

Defendants violate the CLRA.

175. Additionally, Defendants have violated (and continue to violate) the

UCL by engaging in **unfair** business acts and practices by engaging in fictitious

pricing in connection with their products. By misleading consumers about the

price of Defendants' products, Defendants are engaging in a business practice that

is immoral, unethical, oppressive, unscrupulous, and substantially injurious to

consumers.

176. Defendants' false and misleading statements have actually deceived or

are likely to deceive their intended audience. Moreover, these statements have

influenced or are likely to influence the deceived consumers' purchasing decisions.

177.    Defendants' unlawful and unfair business acts and practices have proximately harmed GOAT.

178.    Defendants and GOAT are direct competitors in connection with offering a broad range of goods and services, including apparel, accessories, and online retail services.

179.    Because Defendants and GOAT are competitors, and consumers have been misled into purchasing Defendants' products, Defendants are diverting and/or are likely to divert consumers and business away from GOAT.  Indeed, GOAT is losing business and market share to Defendants, as consumers are choosing to purchase Defendants' products instead of GOAT's products.

180.    As a result of Defendants' unlawful and unfair business acts and practices, GOAT has suffered, and will continue to suffer, damage to its business and goodwill, including through lost sales, revenue, and profits.  Additionally, GOAT has, and will continue to incur, increased advertising and marketing costs to compete with Defendants.

181.    Defendants' conduct is likely to cause irreparable injury to GOAT's business and reputation for which GOAT has no adequate remedy at law. Defendants' actions, if not enjoined, will continue.  Accordingly, GOAT is entitled to injunctive relief pursuant to Business and Professions Code § 17203 to prevent unfair competition.

## **PRAYER**

WHEREFORE, GOAT prays for the following relief:

A.    An injunction ordering Defendants, and their officers, directors, members, agents, servants, employees, and attorneys, and all other persons acting in concert or participating with them (collectively, the "Enjoined Parties"), who receive actual notice of the injunction order by personal or other service, to:

i.    cease all use and never use the GREEN GOAT Mark, the GOAT Marks, or any other mark likely to cause confusion with the GOAT

Marks (including any misspelling or variation of those Marks) in, on, or with any products or services, or in connection with the advertising, marketing, or other promotion, distribution, offering for sale, or sale, of any products or services, including on websites and the Social Media Accounts;

ii.    never use any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, sold or otherwise distributed by the Enjoined Parties is in any manner associated or connected with GOAT, or are licensed, approved, or authorized in any way by GOAT;

iii.    never represent, suggest in any fashion to any third party, or perform any act that may give rise to the belief, that the Enjoined Parties, or any of their products or services, are related to, or authorized or sponsored by, GOAT;

iv.    never register any domain name that contains any of the GOAT Marks (including any misspelling or variation of those Marks), or any domain name that is confusingly similar to any of the GOAT Marks;

v.    transfer to GOAT all domain names in the Enjoined Parties' possession, custody, or control that include the word "goat" (including any misspelling or variation of this word), or that are otherwise confusingly similar to or contain any of the GOAT Marks, or were used in connection with the GREEN GOAT Mark;

vi.    transfer to GOAT, disable, or delete all Social Media Accounts that were used to promote the GREEN GOAT Mark, including all such

accounts in Defendants' possession, custody, or control that include the word "goat" (including any misspelling or variation of this word), or that are otherwise confusingly similar to or contain any of the GOAT Marks, or were used in connection with the GREEN GOAT Mark;

  vii. never unfairly compete with GOAT in any manner whatsoever, or engage in any unfair, fraudulent, or deceptive business practices that relate in any way to the production, distribution, marketing, and/or sale of products and services bearing any of the GOAT Marks or any other mark likely to cause confusion with the GOAT Marks (including any misspelling or variation of those Marks);

  viii. never apply for or seek to register the GREEN GOAT Mark, any of the GOAT Marks, or any other mark likely to cause confusion with the GOAT Marks (including any misspelling or variation of those Marks); and

  ix. cease all false advertising, and never publish or disseminate false and/or misleading information about Defendants' goods and services.

  B. An order, pursuant to 15 U.S.C. § 1118, requiring the Enjoined Parties to deliver and destroy within thirty (30) days all prints, advertising, packaging, goods, and other materials bearing the GREEN GOAT Mark.

  C. An order pursuant to 15 U.S.C. § 1116(a), directing the Enjoined Parties to file with the Court and serve upon GOAT's counsel, within thirty (30) days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which the Enjoined Parties have complied with the injunction.

  D. To give practical effect to the Court's injunction, an order that the social networking service or entity (e.g., Facebook) related to any of the social

1  media accounts subject to this Order shall, within fourteen (14) days of receipt of

2  the Order, transfer, disable, or otherwise cancel those subject accounts at GOAT's

3  request if the Enjoined Parties have not already done so.

4      E.    To give practical effect to the Court's injunction, an order that the

5  Registry or Registrar for any of the foregoing domain names shall, within fourteen

6  (14) days of receipt of the Order, transfer or otherwise assign those subject domain

7  names to GOAT if the Enjoined Parties have not already done so.

8      F.    An order finding that, by the acts complained of above, Defendants

9  have infringed GOAT's federally registered trademarks in violation of 15 U.S.C.

10 § 1114.

11     G.    An order finding that, by the acts complained of above, Defendants

12 have created a false designation of origin and false representation of association in

13 violation of 15 U.S.C. § 1125(a).

14     H.    An order finding that, by the acts complained of above, Defendants

15 have engaged in false advertising in violation of 15 U.S.C. § 1125(a).

16     I.    An order finding that, by the acts complained of above, Defendants

17 have engaged in common law trademark infringement.

18     J.    An order finding that, by the acts complained of above, Defendants

19 have engaged in common law unfair competition.

20     K.    An order finding that, by the acts complained of above, Defendants

21 have violated California's Unfair Competition Law.

22     L.    An order awarding GOAT:

23          i.    Pursuant to 15 U.S.C. § 1117(a), GOAT's actual damages, as

24              well as all of Defendants' profits or gains of any kind from their

25              acts of trademark infringement, false advertising, false

26              designation of origin, and unfair competition, including a

27              trebling of those damages; and

28          ii.   Punitive damages pursuant to California common law.

1    M.    An order pursuant to 15 U.S.C. § 1117(a), finding that this is an

2  exceptional case and awarding GOAT its reasonable attorneys' fees.

3    N.    An order pursuant to 15 U.S.C. § 1117(a), awarding GOAT all of its

4  costs, disbursements, and other expenses incurred due to Defendants' unlawful

5  conduct.

6    O.    An order awarding GOAT pre-judgment interest.

7    P.    An order awarding GOAT such other relief as the Court deems

8  appropriate.

9                                    **JURY DEMAND**

10    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, GOAT

11  demands a trial by jury.

12

13  Dated:  March 17, 2023                    Respectfully submitted,

14                                            LATHAM & WATKINS LLP

15                                            By /s/ Jennifer L. Barry
16                                              Jennifer L. Barry

17                                            *Attorneys for Plaintiff*
                                              1661, Inc. d/b/a GOAT

18

19

20

21

22

23

24

25

26

27

28